UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

GEORGE WILLIAMS, JR., )
                      )
        Plaintiff,    )   Case No. C08-1180-RAJ-JPD
                      )
   v.                 )
                      )
ROBERT J. PALMQUIST, *et al.*, )   REPORT AND RECOMMENDATION
                      )
        Defendants.   )
_____)

INTRODUCTION AND SUMMARY CONCLUSION

Plaintiff George Williams has filed a civil rights action pursuant to *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388 (1971), to allege violations of his constitutional rights during the course of his confinement in the Federal Detention Center at SeaTac, Washington ("FDC SeaTac") in 2007. Specifically, plaintiff alleges in his amended complaint that he was assaulted on various occasions by FDC SeaTac employees, that he was denied access to showers, bedding, and mail while on suicide watch, and that he was denied adequate medical care. (*See* Dkt. No. 8 at 4-8.) Plaintiff's claim of inadequate medical care was previously dismissed based upon plaintiff's failure to exhaust that claim through the Bureau of Prisons administrative remedy process. (*See* Dkt. Nos. 37 and 39.)

REPORT AND RECOMMENDATION
PAGE - 1

Defendants have now filed a motion for summary judgment seeking dismissal of plaintiff's remaining claims.[1] Plaintiff has filed a document entitled "Motion asking the Court to not Grant Defendants Motion to Dismiss and/or for Summary Judgment" which the Court construes as a response to defendants' motion, and defendants have filed a reply brief in support of their motion.

The Court, having reviewed defendants' motion, plaintiff's response thereto, and the balance of the record, concludes that defendants' motion should be granted with respect to all of plaintiff's excessive force claims, and denied with respect to plaintiff's claims that he was denied showers, bedding, and mail while on suicide watch.

## BACKGROUND

Plaintiff was confined at FDC SeaTac from March 24, 2006, until October 18, 2007, while awaiting resolution of federal criminal charges filed against him in the Western District of Washington, Tacoma Division.[2] (Dkt. No. 67 at 2.) During the course of his confinement at FDC SeaTac, plaintiff spent a considerable amount of time in the Special Housing Unit ("SHU"). (*See* Dkt. No. 67, Ex. J at 1-2.) The SHU houses inmates designated for either administrative detention or disciplinary segregation. (*See* Dkt. No. 67 at 4.) Administrative detention is a non-punitive

---

[1] Plaintiff identified 16 defendants in his amended complaint. However, the United States Marshal was not able to effect service on five of the named defendants because those individuals could not be found. (*See* Dkt. Nos. 11-15.) The pending summary judgment motion is brought by the 11 individuals who have been served: Robert J. Palmquist, Ronald Munoz, Marty Patrick, Kevin Steele, Nichole Hayden, Katherine Skillestad Winans, Cynthia Low, Robert Lone, Keith Evans, Larry Carlson, and Eahou Davis.

[2] On October 18, 2007, plaintiff went to court and entered a guilty plea to a charge of felon in possession of a firearm - armed career criminal. (*See* CR06-5267-FDB, Dkt. No. 61.) The plea was accepted and plaintiff was sentenced to 10 years incarceration. (*Id.* at 61 and 62.) Plaintiff was thereafter transferred to the Federal Correctional Institution at Sheridan, Oregon to serve his sentence. (*See* Dkt. No. 67, Ex. J at 1.) On October 16, 2008, plaintiff was returned to the custody of the United States Marshal and he is now incarcerated at the Lane County Jail in Eugene, Oregon where he is awaiting trial on federal charges of assaulting United States government employees. (*See* Dkt. No. 67 at 2 and Dkt. No. 81.)

REPORT AND RECOMMENDATION
PAGE - 2

designation which is invoked when the continued presence of an inmate in the general population would pose a threat to the safety of the inmate or others, would pose a threat to property, or would pose a threat to the secure and orderly operation of the facility. (Dkt. No. 67 at 4.) Disciplinary segregation is a punitive designation which is invoked as a sanction for misconduct and involves the separation of an inmate from the general population for a specified period of time. (*Id.*) The record reflects that plaintiff was assigned to the SHU for both administrative and disciplinary reasons during the course of his confinement at FDC SeaTac. (*See* Dkt. No. 67, Ex. J at 1-2.)

Plaintiff also spent a significant amount of time on suicide watch during the course of his confinement at FDC SeaTac. (*See id.*) The suicide watch cell is located in the Health Services Unit of FDC SeaTac. (Dkt. No. 67 at 5.) Inmates who are deemed suicidal, based on either exhibited behaviors or statements, are immediately placed on suicide watch. (*Id.*) Inmates who are on suicide watch status remain under constant observation for the duration of their stay in the suicide watch cell. (*Id.*) Personal items are not issued to inmates on suicide watch status unless those items are approved by the Chief Psychologist or her designee. (*Id.*) Once an inmate is judged to no longer be suicidal, a psychologist will terminate the suicide watch. (*Id.*)

Plaintiff was placed on suicide watch status in response both to statements threatening self-harm and to actual attempts to inflict self-harm. (*See* Dkt. Nos. 65, 66 and 68 and attached exhibits.) Despite plaintiff's numerous threats and attempts to inflict self-harm, the BOP psychologists who interacted with plaintiff during his incarceration at FDC SeaTac generally believed that plaintiff was merely engaging in acting out behavior and was not truly suicidal. (*See id.*)

The claims asserted by plaintiff in his amended complaint all relate to times when plaintiff was either on suicide watch, or was being transferred to or from suicide watch. Specifically, plaintiff alleges that: (1) he was assaulted by corrections officials on August 16, 2007, after he attempted to hang himself in his cell in the SHU, and again when he arrived in the Health Services Unit after

REPORT AND RECOMMENDATION
PAGE - 3

being transported from the SHU back to the suicide watch cell; (2) he was assaulted again on October 17, 2007; (3) he was denied showers, blankets, and access to his mail while confined in the suicide cell from the end of July 2007 to the end of August 2007, and again from the middle of September 2007 to October 18, 2007; and, (4) he was assaulted by Special Operations Response Team ("SORT"). members on a number of occasions between August 16, 2007, and October 18, 2007. (Dkt. No. 8 at 4-7.) Plaintiff asserts that defendants' conduct violated his right to be free from cruel and unusual punishment and his right to due process. (*See id*. at 9.)

## DISCUSSION

Defendants move for summary judgment on the grounds that plaintiff has failed to establish that his claims of excessive use of force are sufficient to establish a constitutional violation. Defendants also argue that plaintiff's claims fail to allege personal involvement with the requisite specificity. Defendants submitted in support of their summary judgment motion numerous declarations from individuals with knowledge of relevant facts as well as excerpts of video taken of various incidents in which plaintiff was involved during the course of his incarceration at FDC SeaTac. Plaintiff submitted a short brief in response to defendants' motion in which he argues that he can prove his rights were violated. Plaintiff also submitted an affidavit in support of his responsive brief in which he responds more directly to the arguments made by defendants in their motion. Finally, plaintiff submitted his own set of videos for the Court's consideration.[3]

---

[3] After briefing on defendants' summary judgment motion was completed, plaintiff submitted a notice indicating that he would be filing his own set of videos in support of the affidavit which he filed in support of his response to defendants' summary judgment motion. (*See* Dkt. No. 73.) Plaintiff asserts in his notice of filing that defendants tampered with the videos which they submitted to the Court so that they show none of defendants' wrongdoing. (*See id*. at 3.) This Court has reviewed all of the videos submitted by the parties and, while there appear to be some minor differences between the two sets of videos, there do not appear to be any substantive differences.

REPORT AND RECOMMENDATION
PAGE - 4

1                                         <u>Summary Judgment Standard</u>

2        Summary judgment is proper only where "the pleadings, depositions, answers to

3 interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

4 genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of

5 law." Fed.R.Civ.P. 56(c). The moving party has the burden of demonstrating the absence of a

6 genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 257 (1986).

7 Genuine disputes are those for which the evidence is such that a "reasonable jury could return a

8 verdict for the nonmoving party." *Id*. Material facts are those which might affect the outcome of the

9 suit under governing law. *Id*.

10       In response to a properly supported summary judgment motion, the nonmoving party may not

11 rest upon mere allegations or denials in the pleadings, but must set forth specific facts demonstrating

12 a genuine issue of fact for trial and produce evidence sufficient to establish the existence of the

13 elements essential to his case. *See* Fed. R. Civ. P. 56(e). A mere scintilla of evidence is insufficient

14 to create a factual dispute. *See Anderson*, 477 U.S. at 252. In ruling on a motion for summary

15 judgment, the court is required to draw all inferences in a light most favorable to the non-moving

16 party. *Id*. at 248. The court may not weigh the evidence or make credibility determinations. *Id.*

17                                         <u>*Bivens* Standard</u>

18       In order to sustain a cause of action under *Bivens*, a plaintiff must satisfy the requirements of

19 an action pursuant to 42 U.S.C. §1983, except for the substitution of a federal actor in place of a state

20 actor. *Van Strum v. Lawn*, 940 F.2d 406, 409 (9th Cir. 1991). Accordingly, a plaintiff must show (1)

21 that he suffered a violation of rights protected by the Constitution or created by federal statute, and

22 (2) that the violation was proximately caused by a person acting under color of federal law. *See*

23 *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). To satisfy the second prong, a plaintiff must

24

25

26 REPORT AND RECOMMENDATION
PAGE - 5

1  allege facts showing how individually named defendants caused or personally participated in causing

2  the harm alleged in the complaint.  *See Arnold v. IBM*, 637 F.2d 1350, 1355 (9th Cir. 1981).

<u>Excessive Use of Force</u>

Plaintiff alleges in his amended complaint that defendants' use of force violated his Eighth Amendment rights, and defendants analyze plaintiff's excessive force claims by applying an Eighth Amendment standard.  However, because plaintiff was a pretrial detainee at the time his claims arose, the parties' reliance on the Eighth Amendment is misplaced.  The United States Supreme Court has made clear that "the Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment." *Graham v. Connor*, 490 U.S. 386, 395 n. 10 (1989).  And, the Ninth Circuit has determined that "the Fourth Amendment sets the 'applicable constitutional limitations' for considering claims of excessive force during pretrial detention."  *Gibson v. County of Washoe*, 290 F.3d 1175, 1197 (9th Cir. 2002) (citing *Pierce v. Multnomah County*, 76 F.3d 1032, 1043 (9th Cir. 1996)).  Thus, plaintiff's claim of excessive force must be evaluated under the Fourth Amendment's objective reasonableness standard.  *Pierce*, 76 F.3d at 1043.

In *Graham*, the Supreme Court explained that determining whether a particular use of force was "reasonable" under the Fourth Amendment "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."  *Graham*, 490 U.S. at 396 (internal quotations omitted).  Among the factors that must be considered in evaluating a claim of excessive force are "whether the suspect poses an immediate threat to the safety of the officers or others," and "whether he is actively resisting."  *Id*.  *See also Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912 (9th Cir. 2001).  The Supreme Court made clear in *Graham* that "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene rather than with the 20/20 vision of hindsight."  *Graham*, 490 U.S. at 396.

REPORT AND RECOMMENDATION
PAGE - 6

### *1.   August 16, 2007 Use of Force Incidents*

Plaintiff identifies two separate incidents of excessive force that allegedly occurred on August 16, 2007.  (*See* Dkt. No. 8 at 4-5.)  The first incident occurred in the SHU after plaintiff attempted to hang himself in his cell, and the second incident occurred after plaintiff was transported to the Health Services Unit following the attempted hanging.  (*See id.*)

As of August 16, 2007, plaintiff had been on suicide watch for approximately 21 days.  (*See* Dkt. No. 67, Ex. J at 2.)  Two days previously, on August 14, 2007, BOP psychologists had determined that plaintiff could be safely returned to the SHU.  (*See* Dkt. No. 64 at 1-2, Dkt. No. 65, Ex. 1.)  However, plaintiff refused to submit to restraints for escort to the SHU and a use of force team was therefore called upon to extract plaintiff from his cell.  (*Id.*)  Plaintiff was extracted from the suicide watch cell and transferred to the SHU without incident.  (*Id.*)  However, moments after his placement in the SHU cell, plaintiff was observed cutting his wrist with a small piece of mortar or concrete which he apparently found in his cell.  (Dkt. No. 64 at 2.)  The use of force team therefore entered plaintiff's cell and placed him in restraints again.  (*Id.*)  Though BOP psychologists did not believe plaintiff was truly suicidal, plaintiff was returned to suicide watch out of an abundance of caution.  (*Id.*)

On August 16, 2007, BOP officials again attempted to move plaintiff from suicide watch to the SHU.  (*See* Dkt. No. 64 at 3, Dkt. No. 66 at 1-2.)  Given plaintiff's refusal to cooperate with the move to the SHU on August 14, Dr. Low, a Forensic Unit Psychologist at FDC SeaTac, immediately attempted confrontation avoidance procedures with plaintiff regarding the planned move.  (Dkt. No. 66 at 2.)  However, those procedures were not successful.  (*Id.*)  When plaintiff refused to cooperate with the transfer, Warden Palmquist and Captain Munoz were briefed on the situation and authorized a calculated use of force.  (Dkt. No. 64 at 3.)  A five-man use of force team thereafter entered plaintiff's cell, applied restraints, and escorted plaintiff to the SHU.  (*Id.*)  Plaintiff did not resist the

REPORT AND RECOMMENDATION
PAGE - 7

use of force team and the transfer to the SHU was effectuated without incident. (Dkt. No. 64 at 3.) However, approximately ten minutes after being returned to the SHU, plaintiff attempted to hang himself with his jumpsuit. (*Id.*)

Plaintiff does not dispute that he attempted to hang himself. He contends, however, that after the attempted hanging, while still in the SHU, Captain Munoz, and Lieutenants Byram and Monsivais, entered his cell and beat him up.[4] (Dkt. No. 8 at 4.) Plaintiff asserts that he lost consciousness as a result of the beating and that when he regained consciousness he was in handcuffs and leg restraints and was still being beaten. (*Id.*) Plaintiff asserts that when another officer came to the door, Captain Munoz instructed that plaintiff be picked up and moved to the strip cell. (*Id.*) Plaintiff contends that once in the strip cell, he was "slammed" into the wall by Captain Munoz and taken down with a leg sweep. (*Id.*) According to plaintiff, this is when he "busted [his] head open." (*Id.*)

Plaintiff was thereafter transported back to suicide watch. (*See* Dkt. No. 64 at 3.) Plaintiff contends that once he arrived back in the Health Services Unit, he was assaulted by "a number of staff and officers." (*See* Dkt. No. 8 at 4-5.) He further contends that Captain Munoz, and Lieutenants Monsivais and Byram, were involved in the assault, and that while the assault was ongoing, Warden Palmquist "stood around giving orders to his workers." (*Id.*)

Defendants, in support of their motion for summary judgment, have submitted the declaration of S. Leaf, a Physician's Assistant ("PA") at FDC SeaTac, who was present during the events of August 16, 2007.[5] (Dkt. No. 64.) With respect to the first incident, PA Leaf states that when plaintiff tied a jumpsuit around his neck in an attempt to hang himself, four BOP employees rushed into

---

[4] Lieutenants Byram and Monsivais are among the five individuals who were named as defendants in this action but were never served. (*See* Dkt. Nos. 11 and 14.)

[5] Mr. Leaf is not a party to this action.

REPORT AND RECOMMENDATION
PAGE - 8

1 plaintiff's cell and removed the jumpsuit to insure plaintiff's airway. (Dkt. No. 64 at 3.) PA Leaf

2 states that plaintiff was coughing, but his breathing was not labored. (*Id*.) He further states that after

3 plaintiff regained full consciousness, he became disruptive and resistant to attempts to restrain him,

4 and that he threatened staff. (*Id*.) According to PA Leaf, plaintiff continued to be combative as

5 officers attempted to transport him to suicide watch, and that staff put him into a holding cell in order

6 to calm him down. (*Id*. at 3-4.) PA Leaf states that staff placed plaintiff face down in the cell and

7 that plaintiff began to bang his own head on the ground while shouting that he was being beaten.

8 (*Id*.)

9      Once plaintiff arrived on the medical floor, he continued to be aggressive and assaultive

10 towards staff as they attempted to place him in ambulatory restraints and remove his t-shirt and socks.

11 (*Id*. at 4.) PA Leaf notes specifically that plaintiff head-butted Lieutenant Monsivais and kicked him

12 in the abdomen. (*Id*.) According to PA Leaf, once staff had secured the restraints and left plaintiff in

13 the suicide watch cell, plaintiff began to ram his head into the wall. (*Id*.) Warden Palmquist

14 thereafter approved the use of four-point restraints. (*Id*.) After plaintiff was placed in four-point

15 restraints on the bed in the suicide cell, plaintiff began to bang his head on the frame of the bed. (*Id*.)

16 Plaintiff was therefore transported back to the SHU where he could be restrained on a bed with better

17 padding. (*Id*.) PA Leaf states that he medically assessed plaintiff at several points during the events

18 of August 16 and found no serious injuries, only minor self-inflicted abrasions. (Dkt. No. 64 at 5.)

19      The videos submitted by the parties show the following events of August 16: (1) plaintiff's

20 initial move from the suicide watch cell to the SHU; (2) plaintiff on the floor of the strip cell and his

21 subsequent transfer back to the Health Services Unit; and, (3) plaintiff's transfer from the suicide cell

22 to the SHU where he was placed in four-point restraints. The videos do not show plaintiff's attempt

23 to hang himself in his cell in the SHU, nor do they show his removal from that cell. This is the period

24 of time during which plaintiff asserts he was beaten by Captain Munoz and Lieutenants Monsivais

25

26 REPORT AND RECOMMENDATION
PAGE - 9

and Byram. Plaintiff, in his response to defendants' summary judgment motion, asserts that the camera was intentionally turned off during this period of time so that the alleged beating would not be captured on tape. (Dkt. No. 70-2 at 4.) He also suggests that there are additional tapes, which were not provided to him, which would support his claims. (*Id*. at 5.)

Plaintiff offers no evidence to support his assertion that defendants took steps to ensure the video camera did not capture certain events of August 16, 2007, and, defendants dispute plaintiff's suggestion that there is video which has not been provided. (*See* Dkt. No. 72 at 2.) Moreover, the videos that were provided undermine plaintiff's assertion that he was beaten during a time when the camera was turned off. While plaintiff contends that his head was "busted open" during the beating, the videos confirm PA Leaf's description of plaintiff's injuries as minor and self-inflicted. (*See* Dkt. No. 74, Ex. B.) In addition, plaintiff admits that when he was on the floor of the strip cell he began slamming his head into the ground. (*See* Dkt. No. 70-2 at 6.) This admission is consistent with PA Leaf's report that after being placed face down in the strip cell plaintiff "began to bang his own head on the ground, while shouting that he was being beaten." (*See* Dkt. No. 64 at 4.) Plaintiff's admission also explains the injuries which were subsequently identified and photographed. (*See* Dkt. No. 64, Ex. 2 and Dkt. No. 67, Ex. N.) Plaintiff's claim that he was beaten in the SHU following his hanging attempt is simply not supported by any evidence in the record.

With respect to plaintiff's claim that he was assaulted by Captain Munoz, and Lieutenants Monsivais and Byram, once he arrived back in the Health Services Unit, the videos absolutely refute that claim.[6] The videos show that once plaintiff returned to the medical floor, he was combative as officers restrained him so that they could take photos of the injuries he sustained while in the SHU, and he was aggressive and assaultive as officers placed him in ambulatory restraints. (*See* Dkt. No.

---

[6] Plaintiff, in his response to defendants' summary judgment motion, identifies and interprets various events which appear on the August 16, 2007, videos. (*See* Dkt. No. 70-2 at 6-7.) However, as defendants correctly note in their reply brief, the videos speak for themselves.

REPORT AND RECOMMENDATION
PAGE - 10

1    74, Ex. B.) To the extent force was used in the effort to apply the ambulatory restraints, that force

2    was entirely reasonable given plaintiff's aggressive behavior. There is no evidence whatsoever to

3    support a contrary conclusion.

4    Finally, plaintiff asserts that during his transfer from the SHU back to the suicide watch cell

5    following his attempted hanging, Warden Palmquist stood around giving orders to his workers. (Dkt.

6    No. 8 at 4.) Plaintiff does not describe what those orders were nor does he explain how those orders

7    impacted the events of that date. In fact, the only references in the evidence to Warden Palmquist in

8    relation to the events of August 16, 2007, were contained in the declaration of PA Leaf who stated

9    that Warden Palmquist approved a calculated use of force to remove plaintiff from the suicide cell in

10   the first instance, and that he subsequently approved the use of four-point restraints on plaintiff. (*See*

11   Dkt. No. 64 at 3-4.)

12   With respect to plaintiff's extraction from the suicide cell, the record reflects that this action

13   was authorized by Warden Palmquist only after confrontation avoidance procedures failed, and

14   plaintiff adamantly refused to cooperate with the move. And, with respect to the decision to place

15   plaintiff in four-point restraints, the record reflects that this action was authorized only after plaintiff

16   demonstrated that, if left alone in his cell, even in ambulatory restraints, he would attempt to harm

17   himself. Thus, the decisions of Warden Palmquist were entirely reasonable under the circumstances.

18   As the record makes clear that the force used against plaintiff during the events of August 16,

19   2007, was entirely reasonable, defendants are entitled to summary judgment with respect to the

20   claims arising out of those events.

21   ***2.    October 17, 2007 Use of Force Incident***

22   Plaintiff also alleges that he was assaulted on October 17, 2007. (*See* Dkt. No. 8 at 5.)

23   Plaintiff fails to specifically identify who committed this alleged assault. He indicates only that on

24   the date in question, he covered all of the windows in the suicide cell because he wasn't allowed to

REPORT AND RECOMMENDATION
PAGE - 11

1  get his mail for over 30 days, and the SORT thereafter removed him from the cell, placed him on a

2  stretcher, wheeled him up to the four-point cell, and then sat in the cell holding plaintiff down for

3  seven hours while the Warden, the Captain, and the Lieutenants stood around in the background

4  giving orders, making jokes, and telling plaintiff that he could "make all this go away by just taking

5  my plea in the morning." (Dkt. No. 8 at 5-6.)

6  Defendants have submitted in support of their summary judgment motion the declaration of

7  Dr. Lone, the Drug Abuse Program Coordinator at FDC SeaTac.  (*See* Dkt. No. 65.)  Dr. Lone

8  confirms that on October 17, 2007, plaintiff became upset because he was not permitted to read his

9  mail.  (*Id*. at 3.)  According to Dr. Lone, plaintiff proceeded to destroy his mattress and to fashion

10  strips of mattress into a rope which he tied to the metal frame of his bed.  (*Id*.)  When Dr. Lone

11  explained to plaintiff that he could not receive his letters until he was released from suicide watch and

12  went back to the SHU, plaintiff placed the rope around his neck and rolled on the floor to tighten it.

13  (*Id*.)  A use of force team entered the cell and subdued plaintiff without incident.  (*Id*.)

14  Dr. Lone states that he instructed staff to leave plaintiff in the suicide cell, with no property

15  except for his boxer shorts, with the hope that he would calm down and refrain from further self-

16  harm.  (*Id*.)  Plaintiff, however, proceeded to remove his boxer shorts, soak them in the toilet, rip

17  them into strips, and then tie them around his neck in another attempt to harm himself.  (*Id*.)  The use

18  of force team entered the cell and subdued plaintiff again.  (*Id*.)  While the team was subduing him,

19  plaintiff began to bang his head against the wall.  (*Id*.)  Plaintiff was thereafter placed in four-point

20  restraints, which he resisted, and he remained in those restraints until he calmed down and agreed not

21  to hurt himself.  (*Id*.)  Dr. Lone opines that plaintiff's behavior was not suicidal, but manipulative,

22  antagonistic, and controlling.  (*Id*.)

23  This claim is a non-starter because plaintiff fails to specifically identify who participated in

24  the alleged assault.  To the extent plaintiff contends that the Warden, the Captain, and unidentified

25
REPORT AND RECOMMENDATION
26 PAGE - 12

Lieutenants stood around giving orders, plaintiff fails to identify what those orders were. Moreover, a review of the videos of the October 17, 2007, incident reveals that plaintiff was persistent in his efforts to harm himself on that date and was combative during efforts to restrain him. To the extent any force was exerted against plaintiff on that date, the videos confirm that the force was a reasonable response to plaintiff's own behavior. Plaintiff offers no evidence that would support a contrary conclusions. Defendants are therefore entitled to summary judgment with respect to plaintiff's claims arising out of the events of October 17, 2007.

### 3. *Additional Use of Force Incidents*

Plaintiff alleges that from August 16, 2007, to October 18, 2007, he was assaulted on a number of occasions by the SORT and that these assaults were directed by Warden Palmquist and Captain Munoz. (*See* Dkt. No. 8 at 7.) Plaintiff identifies four SORT members whom he believes participated in the alleged assaults, Corrections Officers Cortez, Woods, Patrick and Steele.[7] (*Id*.) Plaintiff also appears to assert, with respect to these alleged assaults, that Special Investigative Agent Evans and Special Investigative Supervisor Carlson are responsible for the assaults because they passed along to the Warden and the Captain information about plaintiff which was not completely true. (*Id*.)

Plaintiff does not specifically identify when the alleged additional assaults occurred. However, there is evidence in the record concerning instances, other than those discussed in detail above, when the use of force team was called upon to respond to incidents involving plaintiff. This Court will briefly identify and discuss the additional incidents.

Defendants have submitted evidence which shows that on October 10, 2007, plaintiff became upset after a discussion with staff during which he was told that assault charges arising from the

---

[7] Officer Cortez and Wood are among the five individual who were named as defendants in this action but were never served. (*See* Dkt. Nos. 12 and 13.)

REPORT AND RECOMMENDATION
PAGE - 13

1  incident on August 16 had not been dismissed and were still pending. (*See* Dkt. No. 68 at 3 and Dkt.
2  No. 74, Ex. D.) Plaintiff attempted to hang himself in his cell using a bedsheet. (*See id*.) When
3  plaintiff refused orders by staff to stop, a five-man use of force team entered the cell, removed the
4  sheet from around plaintiff's neck, and restrained him. (*See* Dkt. No. 68 at 3 and Dkt. No. 74, Ex. D.)
5  Plaintiff struggled with staff as he continued to make threats of self-harm. (*See id*.) Plaintiff was
6  thereafter carried to the suicide watch cell because he refused to walk. (*See id*.) Plaintiff was
7  medically assessed and found to have no injuries. (*See id*.)

8      Dr. Katherine Skillestad Winans, the Chief Psychologist at FDC SeaTac, attempted to talk
9  with plaintiff following the attempted hanging, but plaintiff largely rebuffed those efforts. (*See* Dkt.
10 No. 74, Ex. D.) Once plaintiff was transferred to suicide watch, Dr. Skillestad authorized plaintiff to
11 have only underwear, a paper gown, and a mattress, because plaintiff could not assure his own safety.
12 (*Id*.) Dr. Skillestad also advised plaintiff that she would consider giving him a blanket. (*Id*.) A
13 blanket was provided to plaintiff later that evening, apparently at the direction of Warden Palmquist.
14 (*Id*.)

15     In his response to defendants' summary judgment motion, plaintiff asserts with respect to the
16 October 10 incident only that Dr. Skillestad acknowledged a number of times on video that it
17 appeared plaintiff had been lied to about the disposition of charges arising out of the August 16
18 incident and that he had a right to be mad.[8] (*See* Dkt. No. 70-2 at 8-9.) However, whether or not
19 plaintiff was justified in being upset has no bearing on whether the use of force necessitated by
20 plaintiff's actions on that date was reasonable. The video makes clear that the response of corrections
21 officers to plaintiff's attempt to hang himself and to plaintiff's subsequent refusal to cooperate with
22 his transport to suicide watch was measured and entirely reasonable. (*See* Dkt. No. 74, Ex. D.)

---

[8] The Court notes that plaintiff's interpretation of what Dr. Skillestad told him is not entirely accurate. Dr. Skillestad merely acknowledged that there may have been some mis-communication and that she understood plaintiff was frustrated. (*See* Dkt. No. 74, Ex. D.)

REPORT AND RECOMMENDATION
PAGE - 14

Defendants have submitted evidence which shows that on October 11, 2007, plaintiff was again assessed by Dr. Skillestad who determined that plaintiff was not actively suicidal, but still could not assure his own safety. (Dkt. No. 68 at 4.) She therefore directed that plaintiff remain on suicide watch and that the blanket provided the previous evening be removed. (*Id*.) Plaintiff was thereafter ordered to submit to handcuffs so that staff could remove the blanket and search the cell, but plaintiff refused the order. (Dkt. No. 64 at 5.) When confrontation avoidance procedures failed, a use of force team was assembled to apply restraints and remove the blanket. (*Id*.) Prior to the team entering the cell, plaintiff climbed up onto the ledge of the window. (*Id*.) When the team approached plaintiff, plaintiff jumped from the window ledge on top of the team. (*Id*.) As the team attempted to control plaintiff, plaintiff fell to the floor where he hit the left side of his back on the top edge of the metal bed. (*Id*.) Plaintiff continued to resist, but was quickly restrained. (*Id*.) After the cell search was completed, plaintiff was released from restraints and the use of force team left the cell. (*Id*.)

Shortly thereafter, the use of force team was directed back to the cell because plaintiff was attempting to cut his left wrist with a piece of plastic. (*Id*. at 6.) Plaintiff resisted efforts to restrain him. (*Id*.) Once restraints were in place, plaintiff continued to struggle with the team and continued to make threats of self-harm. (*Id*.) A decision was made to transfer plaintiff to the SHU where he could be placed in four-point restraints on a bed with the extra padding necessary to preclude plaintiff from inflicting harm on himself. (*Id*.) Because of plaintiff's lack of cooperation, he was placed on a gurney for transport to the SHU. (*Id*.) Plaintiff remained in four-point restraints for approximately two hours before being returned to the suicide watch cell. (*Id*.) Plaintiff suffered minor injuries as a result of the incidents in the suicide cell including a laceration to his left wrist from the self-cutting, mild abrasions to his forehead and the back of his head, and contusions to his lower back sustained after he jumped on the use of force team and fell to the floor. (*Id*.)

REPORT AND RECOMMENDATION
PAGE - 15

Plaintiff, in his response to defendants' motion, asserts that defendants were untruthful in their motion papers when they indicated that plaintiff fell to the ground after he jumped on the use of force team from the window ledge. (*See* Dkt. No. 70-2 at 9.) Plaintiff contends that he was "slammed by force" to the floor where he hit the corner of the metal bed and that the video supports this assertion. (Dkt. No. 70-2 at 9.) While the video shows that the team took plaintiff to the ground in an effort to control him, and that plaintiff hit the edge of the metal bed in the process, the video does not support plaintiff's characterization that officers "slammed" him to the floor. (*See* Dkt. No. 74, Ex. E.) The video makes clear that the team was forced to respond quickly to plaintiff's aggressive conduct and that their response was reasonable under the circumstances.

Finally, defendants have submitted evidence which show that on October 15, 2007, the use of force team was once again called upon to engage with plaintiff. At that time, plaintiff was still on suicide watch. Lieutenant Hayden, a Supervisor in the Correctional Services Department at FDC SeaTac, states that on that day plaintiff was observed with a broken plastic cup in his cell and it appeared to staff that plaintiff was attempting to cut his wrist with a piece of the plastic. (Dkt. No. 62 at 2.) Plaintiff was ordered to surrender the cup or to cuff-up so that a search of the cell could be conducted. (*Id*.) When plaintiff refused to comply with the directives, a five-man use of force team entered the cell and restrained plaintiff while a search of the cell was conducted. (*Id*.) After the use of force team exited the cell, plaintiff refused to allow the handcuffs to be removed. (*Id*.) According to Lieutenant Hayden, plaintiff refused staff requests to allow them to remove the cuffs for approximately an hour. (*Id*.)

After the cuffs were removed, plaintiff then began to tear his plastic mattress cover into strips which he tied together to make a noose. (*See id*.) Plaintiff placed the noose over his head and began to turn in circles until the noose was tightened around his neck. (*Id*.) A use of force team entered the cell, removed the noose, and placed plaintiff in restraints. (*Id*.) Plaintiff was transported to the SHU

REPORT AND RECOMMENDATION
PAGE - 16

where he was placed in four-point restraints for approximately 40 minutes. (Dkt. No. 62 at 2.) Lieutenant Hayden states that plaintiff was examined for injuries at several points during this incident and that no serious injuries were reported. (*Id*. at 3.)

Plaintiff, in his response to defendants' motion, asserts with respect to the October 15 incident only that he kept the cuffs on on that day, because the first time the officers went into his cell "there was no camera and they just jumped on me for no reason so I want to get a camera down there to show this." (Dkt. No. 70-2.) In fact, there is a video of the first incident on October 15 and that video makes clear that officers did not "just jump on [him] for no reason," they were forced to restrain plaintiff when he refused to comply with directives that he either surrender the broken cup or cuff-up. (*See* Dkt .No. 74, Ex. F.) The evidence before this Court makes clear that the force used against plaintiff on October 15, 2007, was necessitated by plaintiff's own conduct, and that the degree of force used was entirely reasonable under the circumstances.

Not only was the amount of force used in the above incidents entirely reasonable, the record is devoid of any evidence demonstrating that Warden Palmquist, Captain Munoz, or either of the two SORT members who have been served in this action personally participated in any of the incidents identified above. The record is also devoid of any evidence that the above incidents were attributable to defendants Evans and Carlson because of alleged misinformation they provided the Warden. Accordingly, defendants are entitled to summary judgment with respect to any claims of excessive force arising out of the three incidents discussed immediately above.

<u>Deprivation of Showers, Bedding and Mail</u>

Plaintiff asserts in his amended complaint that during the time he was on suicide watch from the end of July 2007 to the end of August 2007, and again from the middle of September 2007 to October 18, 2007, he was denied showers, bedding, and mail. (Dkt. No. 8 at 6.) With respect to the showers, plaintiff alleges in his amended complaint that the Warden told him that Dr. Skillestad, the

REPORT AND RECOMMENDATION
PAGE - 17

Chief of Psychiatric Services, was "in control of it all" because plaintiff was in the suicide cell and that "she is the one refusing me the showers." (Dkt. No. 8 at 6.) With respect to the bedding, plaintiff alleges that he was told every day he wasn't getting any blankets and that when he asked Dr. Low and Dr. Lone why he couldn't have a blanket they told him it was a punishment intended to get him out of the suicide cell. (*Id*.) Finally, with respect to the mail, plaintiff alleges that he was denied access to all mail, including his legal mail, for 21 days during his first stay on suicide watch and for all of his second stay on suicide watch. (*Id*. at 6-7.)

Defendants, in their motion for summary judgment, argue that plaintiff fails to allege personal involvement with the requisite specificity as to these claims. Defendants further argue that they are entitled to qualified immunity with respect to these claims. The Court disagrees. The allegations set forth by plaintiff in his amended complaint are arguably sufficient to allege a cause of action against Dr. Skillestad for denying him showers while he was on suicide watch. And, while the amended complaint does not specifically identify those individuals responsible for denying him access to blankets and to mail, plaintiff does indicate in his papers opposing defendants' summary judgment motion that Dr. Skillestad was the individual responsible for all of the alleged deprivations.[9] In this Court's view, plaintiff has adequately alleged a cause of action against Dr. Skillestad relating to the conditions of his confinement while on suicide watch. Plaintiff has not, however, adequately alleged a cause of action against any other named defendant relating to the conditions of his confinement while on suicide watch.

As noted above, defendants also argue that they are entitled to qualified immunity with respect to plaintiff claims that he was denied showers, bedding, and mail. However, defendants once

---

[9] In the affidavit filed by plaintiff in support of his response to defendants' summary judgment motion, plaintiff asserts that "the Wardens [sic] statement to me that Psych service Ms Skillestad was at fault of dening [sic] me my mail, legal mail, legal calls, showers, blankets, and so on, clearly would show it was her doing." (Dkt. No. 70-2 at 13.)

REPORT AND RECOMMENDATION
PAGE - 18

again analyze plaintiff's claims under the Eighth Amendment.  Because plaintiff was a pretrial detainee at the time his claims arose, his rights derive from the Due Process Clause of the Fourteenth Amendment and not from the Eighth Amendment's prohibition against cruel and unusual punishment. *Bell v. Wolfish*, 441 U.S. 520, 535 (1979).

The test for identifying unconstitutional punishment at the pretrial stage of a criminal proceeding requires a court to examine "whether there was an express intent to punish, or 'whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it].'" *Demery v. Arpaio*, 378 F.3d 1020, 1028 (9th Cir. 2004) (quoting *Bell*, 441 U.S. at 538).  "For a particular governmental action to constitute punishment, (1) that action must cause the detainee to suffer some harm or 'disability,' and (2) the purpose of the governmental action must be to punish the detainee." *Demery*, 378 F.3d at 1029.  Further, "to constitute punishment, the harm or disability caused by the government's action must either significantly exceed, or be independent of, the inherent discomforts of confinement." *Id.* at 1030.

At this juncture, there are insufficient facts in the record to allow the Court to evaluate plaintiff's conditions of confinement claims under the standard set forth above.  Accordingly, this Court recommends that defendants' motion for summary judgment be denied with respect to those claims and that plaintiff be permitted to proceed on the conditions of confinement claims alleged against Dr. Skillestad.

## Unserved Defendants

As noted above, there are five individuals who were named as defendants in this action who were never served.  The unserved defendants are:  Lieutenant Byram, Lieutenant Monsivais, Corrections Officer Cortez, Corrections Officer Woods, and Dr. S. Davis.  While the Court is responsible for serving defendants in an action, such as this one, where the plaintiff is granted leave

REPORT AND RECOMMENDATION
PAGE - 19

to proceed *in forma pauperis*, plaintiff is responsible for providing the Court with current addresses for all named defendants. As attempts to serve the above named defendants at the addressed provided by plaintiff were unsuccessful, and as plaintiff has provided no other addresses at which service might be attempted, this Court recommends that the five individuals identified above be dismissed from this action without prejudice.

## CONCLUSION

Based upon the foregoing, this Court recommends that defendants' motion for summary judgment be granted with respect to all of plaintiff's excessive force claims, and denied with respect to plaintiff's claims, alleged only against Dr. Skillestad, that he was denied showers, bedding and mail while on suicide watch. This Court further recommends that plaintiff's amended complaint be dismissed with prejudice as to defendants Robert Palmquist, Ronald Munoz, Marty Patrick, Kevin Steele, Nichole Hayden, Cynthia Low, Robert Lone, Keith Evans, Larry Carlson, and Eahou Davis. Plaintiff's amended complaint should be dismissed without prejudice as to defendants Byram, Monsivais, Cortez, Woods, and S. Davis who were never served, and therefore never appeared, in this action. Finally, this Court recommends that this action be permitted to proceed at this time against Katherine Skillestad Winans with respect to plaintiff's claims that she denied him showers, bedding and mail while he was on suicide watch. A proposed order accompanies this Report and Recommendation.

DATED this 9th day of June, 2010.

/s/ James P. Donohue
JAMES P. DONOHUE
United States Magistrate Judge