1

2

3

4

5

6

7          UNITED STATES DISTRICT COURT
      WESTERN DISTRICT OF WASHINGTON
8                 AT SEATTLE

9

GEORGE WILLIAMS, JR.,                    )
10                                       )
              Plaintiff,                 )      Case No. C08-1180-RAJ-JPD
11                                       )
              v.                         )
12                                       )
ROBERT J. PALMQUIST, *et al.*,           )      REPORT AND RECOMMENDATION
13                                       )
              Defendants.                )
14 _____)

15          <u>INTRODUCTION AND SUMMARY CONCLUSION</u>

16          This is a civil rights action proceeding under *Bivens v. Six Unknown Federal Narcotics*

17 *Agents*, 403 U.S. 388 (1971).  Plaintiff George Williams, Jr. is a federal prisoner who is currently

18 confined at USP Victorville in Adelanto, California.  He filed the instant action in August 2008

19 seeking declaratory and injunctive relief, as well as monetary damages, for alleged violations of his

20 constitutional rights during the course of his confinement at the Federal Detention Center at SeaTac,

21 Washington ("FDC SeaTac") in 2007.  Specifically, plaintiff alleged in his amended complaint that

22 he was assaulted on various occasions by FDC SeaTac employees, that he was denied access to

23 showers, bedding, and mail while on suicide watch, and that he was denied adequate medical care.

24 (*See* Dkt. No. 8 at 4-8.)

25

REPORT AND RECOMMENDATION
26 PAGE - 1

1    A majority of plaintiff's claims have been dismissed.  All that remains at this juncture is

2    plaintiff's claim that he was denied access to showers, blankets, and mail while on suicide watch.

3    This claim implicates the single remaining defendant in this action, Dr. Katherine Skillestad Winans,

4    the Chief Psychologist at FDC SeaTac.  Dr. Skillestad Winans now moves for summary judgment.

5    Plaintiff has been advised of the summary judgment requirements pursuant to *Rand v. Rowland*, 154

6    F.3d 952 (9th Cir. 1998), but has filed no response to defendant's motion.  The Court, having

7    reviewed the pending motion for summary judgment, and the balance of the record, concludes that

8    defendant's motion for summary judgment should be granted and that plaintiff's amended complaint,

9    and this action, should be dismissed with prejudice.

10                                   BACKGROUND

11    Plaintiff was confined at FDC SeaTac from March 24, 2006 until October 18, 2007 while

12    awaiting resolution of federal criminal charges filed against him in this District.  (Dkt. No. 67 at 2;

13    Dkt. No. 82 at 2.)  During the course of his confinement at FDC SeaTac, plaintiff spent a

14    considerable amount of time on suicide watch because of numerous threats and attempts to inflict

15    self-harm.[1]  (*See* Dkt. Nos. 65, 66 and 68.  *See also* Dkt. No. 67, Ex. J at 1-2.)

16    The record reflects that plaintiff was placed on suicide watch for the first time on July 4, 2007

17    after he ingested a large number of pills in his cell in the Special Housing Unit ("SHU") two days

18    prior and was sent to an outside hospital for treatment.  (*See* Dkt. No. 68, Ex. 1).  The purpose of this

19    placement was to observe and assess plaintiff after he returned from the hospital.  (*Id*.)  Plaintiff

20    remained on suicide watch for approximately 22 hours before being transitioned back to the SHU.

21    (Dkt. No. 89 at 2.)

22    _____

23    [1]  Despite plaintiff's numerous threats and attempts to inflict self-harm, the BOP
      psychologists who interacted with plaintiff during his incarceration at FDC SeaTac generally

24    believed that plaintiff was merely engaging in acting out behavior and was not truly suicidal.  (*See*
      Dkt. Nos. 65, 66 and 68 and attached exhibits.)

25    REPORT AND RECOMMENDATION

26    PAGE - 2

1    Plaintiff was returned to suicide watch on July 26, 2007 after advising Dr. Skillestad Winans

2  that he was suicidal.  (Dkt. No. 89 at 2-3 and Dkt. No. 68, Ex. 2.)  While a couple of attempts were

3  made to transfer plaintiff back to the SHU, plaintiff essentially remained on suicide watch until

4  August 27, 2007 when he indicated that he was willing to go back to the SHU.  (*See* Dkt. No. 89 at 5-

5  7.  *See also* Dkt. No. 64 at 1-4.)

6    Plaintiff was placed on suicide watch again on September 28, 2007 after threatening suicide

7  because of his displeasure over his cell assignment in the SHU.  (Dkt. No. 89 at 7-8.)  Plaintiff

8  remained on suicide watch for approximately 18 hours before being returned to the SHU on

9  September 29, 2007.  (*Id*. at 8.)

10    Plaintiff was placed on suicide watch for a final time on October 10, 2007 after attempting to

11  hang himself with a torn bed sheet.  (*Id*., Ex. 9.)  Plaintiff was released from suicide watch on

12  October 18, 2007 to attend court.  (*Id*. at 9-10 and Ex. 12.)  Following his court appearance, plaintiff

13  was transferred to the Federal Correctional Institution at Sheridan, Oregon.  (Dkt. No. 67, Ex. J at 1.)

14    During the times plaintiff was assigned to suicide watch, it was the responsibility of Dr.

15  Skillestad Winans, or her designee, to conduct interviews of, or monitor, plaintiff on a daily basis,

16  and to specify the type of personal property, bedding, and clothing that he was to be allowed.  (*See*

17  Dkt. No. 89 at 1 and Dkt. No. 90, Ex. 1 at 3, 12.)  However, while Dr. Skillestad Winans was

18  responsible for establishing the basic conditions of plaintiff's confinement on suicide watch,

19  correctional staff were responsible for plaintiff's daily custodial care.  (Dkt. No. 90, Ex. 1 at 12..)

20    As noted above, plaintiff complains in this action about the conditions of his confinement

21  while on suicide watch; specifically, that he was deprived of showers, blankets, and access to mail.

22  Plaintiff identifies two time periods during which the alleged deprivations occurred: the end of July

23  2007 through the end of August 2007; and, the middle of September 2007 through October 18, 2007.

24  These time periods cover three separate placements on suicide watch.  Plaintiff complains that,

25

26  REPORT AND RECOMMENDATION
   PAGE - 3

1  during the first period of time, he was denied a shower for 27 straight days, he was denied any type

2  of blanket, and he was denied all mail for 21 days.  (*See* Dkt. No. 8 at 6-7.)   As to the second time

3  period of time, plaintiff asserts that he was denied blankets and mail.  (*Id*.)  Plaintiff does not appear

4  to claim that he was denied showers during this period.

5       Defendant, in her motion for summary judgment, asserts that she did not impose the

6  conditions of confinement complained of in the manner plaintiff alleges.  (*See* Dkt. No. 88.)  She

7  further asserts that the restrictions that were imposed did not violated plaintiff's federal constitutional

8  rights.  (*Id*.)

9                                DISCUSSION

10                          Summary Judgment Standard

11      Summary judgment is proper only where "the pleadings, depositions, answers to

12  interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

13  genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of

14  law."  Fed.R.Civ.P. 56(c).  The moving party has the burden of demonstrating the absence of a

15  genuine issue of material fact for trial.  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 257 (1986).

16  Genuine disputes are those for which the evidence is such that a "reasonable jury could return a

17  verdict for the nonmoving party."  *Id*.  Material facts are those which might affect the outcome of the

18  suit under governing law.  *Id*.  In response to a properly supported summary judgment motion, the

19  nonmoving party may not rest upon mere allegations or denials in the pleadings, but must set forth

20  specific facts demonstrating a genuine issue of fact for trial and produce evidence sufficient to

21  establish the existence of the elements essential to his case.  *See* Fed. R. Civ. P. 56(e).  A mere

22  scintilla of evidence is insufficient to create a factual dispute.  *See Anderson*, 477 U.S. at 252.

23                              *Bivens* Standard

24      In order to sustain a cause of action under *Bivens*, a plaintiff must satisfy the requirements of

25

26  REPORT AND RECOMMENDATION
    PAGE - 4

an action pursuant to 42 U.S.C. §1983, except for the substitution of a federal actor in place of a state actor. *Van Strum v. Lawn*, 940 F.2d 406, 409 (9th Cir. 1991). Accordingly, a plaintiff must show (1) that he suffered a violation of rights protected by the Constitution or created by federal statute, and (2) that the violation was proximately caused by a person acting under color of federal law. *See Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). To satisfy the second prong, a plaintiff must allege facts showing how individually named defendants caused or personally participated in causing the harm alleged in the complaint. *See Arnold v. IBM*, 637 F.2d 1350, 1355 (9th Cir. 1981).

Due Process

Because plaintiff was a pretrial detainee at the time his claims arose, his rights derive from the Due Process Clause of the Fourteenth Amendment. *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). Due process requires that a pretrial detainee not be punished prior to an adjudication of guilt. *Id*. at 535. However, while the Due Process Clause protects pretrial detainees from punishment, not every disability imposed during pretrial detention constitutes "punishment" in the constitutional sense. *Id*. at 537.

The test for identifying unconstitutional punishment at the pretrial stage of a criminal proceeding requires a court to examine "whether there was an express intent to punish, or 'whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it].'" *Demery v. Arpaio*, 378 F.3d 1020, 1028 (9th Cir. 2004) (quoting *Bell*, 441 U.S. at 538). "For a particular governmental action to constitute punishment, (1) that action must cause the detainee to suffer some harm or 'disability,' and (2) the purpose of the governmental action must be to punish the detainee." *Demery*, 378 F.3d at 1029. Further, "to constitute punishment, the harm or disability caused by the government's action must either significantly exceed, or be independent of, the inherent discomforts of confinement." *Id*. at 1030.

REPORT AND RECOMMENDATION
PAGE - 5

1      "[M]aintaining institutional security and preserving internal order and discipline are essential

2   goals that may require limitation or retraction of the retained constitutional rights of both convicted

3   prisoners and pretrial detainees." *Bell*, 441 U.S. at 546.  *Accord Jones*, 393 F.3d at 932 ("Legitimate,

4   non-punitive government interests include ensuring a detainee's presence at trial, maintaining jail

5   security, and effective management of a detention facility.")  Moreover, corrections administrators

6   "should be accorded wide-ranging deference in the adoption and execution of policies and practices

7   that in their judgment are needed to preserve internal order and discipline and to maintain

8   institutional security." *Bell*, 441 U.S. at 547.

9      ***1.    Showers***

10      Plaintiff asserts that he was denied a shower for 27 straight days during the time he spent on

11   suicide watch from July 26, 2007 to August 27, 2007.  While the evidence in the record demonstrates

12   that there were restrictions imposed on plaintiff's ability to shower during his time on suicide watch,

13   the evidence does not support plaintiff's assertion that Dr. Skillestad Winans caused him to be denied

14   him showers for any extended period of time.

15      In a declaration submitted in conjunction with her summary judgment motion, Dr. Skillestad

16   Winans explains that, pursuant to policy, showers are permitted for inmates on suicide watch only

17   with the authorization of the Suicide Prevention Program Coordinator[2], the psychologist assisting

18   with suicide watch, or the on-call psychologist, and only when two staff members are present to

19   shower the inmate.  (Dkt. No. 89 at 3-4.)  Dr. Skillestad Winans further explains that "[i]t is

20   inherently dangerous to the inmate himself and to the staff to permit unauthorized or unobserved

21

22

23      [2]  The Federal Bureau of Prisons ("BOP") operates a Suicide Prevention Program ("SPP")
    which is intended to "assist staff in identifying and managing potentially suicidal inmates."  (Dkt.
    No. 90, Ex. 1 at 1.)  Each BOP institution has an SPP Program Coordinator.  (*Id*., Ex. 1 at 3.)  Dr.
24   Skillestad Winans, in her role as Chief Psychologist, serves as the SPP Program Coordinator at FDC
    SeaTac.  (*See* Dkt. No. 89 at 1 and Dkt. No. 90, Ex. 1 at 3.)
25

26   REPORT AND RECOMMENDATION
    PAGE - 6

1   showers to persons on Suicide Watch, particularly should the inmate begin to act out and need to be

2   restrained, as Plaintiff repeatedly needed to be."  (Dkt. No. 89 at 4.)  Finally, Dr. Skillestad Winans

3   explains that even when showers are not immediately available, sinks are provided in the suicide

4   watch cells, as well as personal hygiene supplies, which permit self-care.  (*Id*.)

5          With respect to plaintiff's specific claims, Dr. Skillestad Winans notes that on July 27, 2007,

6   at 1:30 a.m., less than 24 hours after being placed on suicide watch, plaintiff asked to take a shower.

7   (Dkt. No. 89 at 3-4.)  Plaintiff was advised that it was not possible at that hour, apparently because of

8   the staffing requirements described above.  (*Id*.)  However, plaintiff was authorized to shower on July

9   29, 2007.  (*Id*. at 4 and Ex. 2.)  On August 3, 2007, plaintiff again asked to take a shower.  Despite a

10  threat later that same day from plaintiff that he would "kill himself at the first chance," plaintiff was

11  authorized to take a shower the following day and he did, in fact, do so.  (Dkt. No. 89 at 4.)

12         On August 12, 2007, plaintiff again asked to take a shower.  (*Id*. at 5.)  According to Dr.

13  Skillestad Winans, plaintiff was granted authorization to take a shower, but it is not clear that he ever

14  did so.  (*See id*.)  The record suggests that a subsequent threat directed at a staff member, and

15  repeated threats by plaintiff to inflict self-harm, may have precluded plaintiff from receiving the

16  shower that had been authorized on that occasion.  (*Id*.)  Finally, it appears that plaintiff requested a

17  shower on August 16, 2007.  (*See* Dkt. No. 89, Ex. 6 at 3.)  There is no indication in the record that

18  plaintiff was provided a shower in response to that request.  However, Dr. Skillestad Winans states in

19  her declaration that during the period of August 16 through August 27, plaintiff was authorized to

20  take a shower whenever staff were able to manage it.  (Dkt. No. 89 at 6-7.)

21         Dr. Skillestad Winans' declaration, and the Suicide Watch Observation Log submitted as an

22  attachment to the declaration, appear to indicate that plaintiff had only one shower during the

23  relevant time period, the one taken on August 4, 2007.  (*Id*., Ex. 3 at 64.)  However, the record

24  demonstrates that plaintiff was repeatedly granted authorization by Dr. Skillestad Winans, or her

25

26  REPORT AND RECOMMENDATION
    PAGE - 7

1    designee, to shower during the period of time in question.  Dr. Skillestad Winans cannot be held

2    responsible for any failure by custodial staff to provide plaintiff with showers that she authorized.

3         Moreover, to the extent Dr. Skillestad Winans did place restrictions on plaintiff's ability to

4    shower, there is no evidence that any such restrictions were intended to punish plaintiff.

5    Accordingly, Dr. Skillestad Winans is entitled to summary judgment with respect to plaintiff's claim

6    that she denied him showers while he was on suicide watch from the end of July 2007 through the

7    end of August 2007.

8         ***2.    Bedding***

9         Plaintiff also asserts that he was denied any type of blanket during his time on suicide watch.

10   While the evidence in the record demonstrates that there were times when plaintiff's access to

11   blankets was, in fact, restricted, the evidence does not support plaintiff's assertion that he was denied

12   a blanket for the entirety of his time on suicide watch.  Moreover, the evidence in the record amply

13   demonstrates that to the extent Dr. Skillestad Winans restricted plaintiff's access to blankets, the

14   restrictions imposed were reasonable and caused plaintiff no significant harm.

15        In her declaration, Dr. Skillestad Winans explains that blankets, particularly standard

16   blankets, can be dangerous instruments in the hands of individuals who are on suicide watch.  (*Id*. at

17   3.)  With respect to the specific restrictions placed on plaintiff, Dr. Skillestad Winans states that when

18   plaintiff was admitted to suicide watch on July 26, 2007, after making suicidal threats, he was not

19   issued a standard blanket.  Rather, he was issued only a t-shirt, underwear, socks, and a mattress.

20   (Dkt. No. 89 at 3.)  However, later that morning, plaintiff was issued a small blanket and then a larger

21   one which he retained until at least August 14, 2007, a period of over two weeks.  (*Id*.)

22        On August 14, 2007, BOP psychologists determined that plaintiff could safely be returned to

23   the SHU despite plaintiff's assertion that he was still suicidal and his threat that he would kill himself

24   if moved to the SHU.  (*See* Dkt. No. 64 at 1-2, Dkt. No. 65 at 1-2.)  Once plaintiff was placed in the

25

26   REPORT AND RECOMMENDATION
     PAGE - 8

1    SHU cell, he began cutting his wrist with a small piece of mortar or concrete he found in his cell and,

2    thus, he was returned to suicide watch even though BOP psychologists did not believe he was truly

3    suicidal.  (Dkt. No. 64 at 2; Dkt. No. 65, Ex. 2.)  Plaintiff was issued only underwear and a paper

4    gown upon his re-admission to suicide watch both to assure his own safety and to discourage what

5    was considered to be highly manipulative behavior on plaintiff's part.[3]  (*See* Dkt. No. 65 at 2-3 and

6    Ex. 2.)

7            On August 16, 2007,  BOP officials again attempted to move plaintiff from suicide watch to

8    the SHU.  (Dkt. No. 89 at 6.)  A short time after being returned to the SHU, plaintiff attempted to

9    hang himself with his jumpsuit.  (*Id*.)  Plaintiff was thereafter returned to suicide watch.  (*Id*.)  Upon

10   his return to suicide watch, plaintiff was issued only a paper gown and underwear, again to assure his

11   own safety and to discourage his highly manipulative behavior.  (*Id*.)  On August 17, 2007, plaintiff

12   was issued a paper blanket.  (*Id*.)  Plaintiff thereafter refused to speak to BOP psychologists for a

13   period of several days and, in so doing, denied psychologists the opportunity to assess his safety and

14   behavior and to perhaps ease some of the restrictions imposed upon him.  (*Id*.)  Thus, plaintiff

15   continued to have access to only a paper blanket.

16           On August 27, 2007, Dr. Skillestad Winans discontinued plaintiff's suicide watch because

17   she, in conjunction with the medical staff, determined that plaintiff was not genuinely suicidal and,

18   instead, had been engaging in attention-seeking and manipulative behaviors.  (*Id*.)  Dr. Skillestad

19   Winans authorized plaintiff to receive two blankets upon his return to the SHU.  (*Id*., Ex. 6 at 79.)

20           On September 28, 2007, plaintiff returned to FDC SeaTac from court and made threats that he

21   was suicidal when his original cell was no longer available as a result of new inmates having arrived

22   at FDC SeaTac during the day.  (*Id*. at 7-8.)  Plaintiff also tied his jumpsuit into a noose though he

23   

24          [3]  On this occasion, it was Dr. Robert Lone, the Drug Abuse Program Coordinator at FDC
     SeaTac, who did the suicide risk assessment of plaintiff and dictated the initial conditions of
     plaintiff's confinement on suicide watch.  (*See* Dkt. No. 65 at 2-3 and Ex. 2.)

25   

26   REPORT AND RECOMMENDATION
     PAGE - 9

1   did not actually attempt to hang himself.  (Dkt. No. 89 at 8.)  As a precaution, plaintiff was placed on

2   suicide watch for the evening.  (*Id*.)  Approximately 18 hours later, plaintiff was returned to the SHU

3   after a  BOP psychologist interviewed plaintiff and determined that he was not suicidal but was

4   merely engaging in manipulative behavior.  (*Id*.)  It is not clear from the record what property

5   plaintiff was authorized during this brief stay on suicide watch.  However, it does not appear that

6   plaintiff was authorized to have a blanket as there is some indication in the record that plaintiff

7   attempted to negotiate for a paper blanket on the morning of September 29, 2007.  (*See* Dkt. No. 89,

8   Ex. 8 at 5.)

9        On October 10, 2007, plaintiff was returned to suicide watch after attempting to hang himself

10   in his cell using a bed sheet.  (*See* Dkt. No. 89 at 8 and Ex. 9.)  Dr. Skillestad Winans assessed

11   plaintiff and authorized issuance of only underwear, a paper gown, and a mattress in order to assure

12   plaintiff's safety and to discourage what was considered highly manipulative behavior on plaintiff's

13   part.  (*Id*.)  Plaintiff was provided a blanket later that evening at the direction of the Warden.  (*Id*.,

14   Ex. 11 at 6.)  Dr. Skillestad Winans did not authorize the blanket and, the following morning, she

15   directed that the blanket be removed and that plaintiff remain on suicide watch.  (Dkt. No. 89 at 9.)

16   Plaintiff was issued a paper blanket later on the evening of October 11, 2007.  (*Id*.)  At no time

17   during that evening did plaintiff request another blanket.  (*Id*.)

18        Plaintiff refused to meet with BOP psychologists on October 12 and 13, 2007, and on October

19   14, 2007, plaintiff reported to BOP psychologists that he was still suicidal.  (*Id*.)  Plaintiff did not

20   request another blanket during these three days nor did he make any such requests on October 15 or

21   16, 2007.  (*Id*.)  On October 18, 2007, plaintiff was released from suicide watch to attend court and

22   he was authorized to be released permanently to the SHU as he was not actively suicidal.  (*Id*. at 10.)

23        The record demonstrates that for most of the time in question, plaintiff was provided a blanket

24   of some sort.  However, his access to a standard blanket was significantly restricted because of his

25

26   REPORT AND RECOMMENDATION
    PAGE - 10

1    repeated attempts to inflict self-harm.  Restrictions such as this which are clearly intended to ensure

2    the safety of the inmate and to maintain internal order and discipline do not implicate federal

3    constitutional concerns.  Accordingly, Dr. Skillestad Winans is entitled to summary judgment with

4    respect to plaintiff's claim that he was denied blankets while on suicide watch.

5          ***3.      Mail***

6          Finally, plaintiff asserts that he was denied mail for the first 21 days of his July/August period

7    of confinement on suicide watch and for the entirety of his September/October period of confinement

8    on suicide watch.  In her declaration, Dr. Skillestad Winans explains that incoming personal mail is

9    strictly regulated for inmates on suicide watch for the safety of both the inmate and the staff.  (Dkt.

10   No. 89 at 4.)  According to Dr. Skillestad Winans, "[i]t is difficult for mental health professionals to

11   predict how personal mail will affect the mental state of an inmate."  (*Id*. at 5.)  She further states that

12   "[t]his is standard medical practice and is applied uniformly to inmates on Suicide Watch."  (*Id*.)

13         In another declaration submitted in support of Dr. Skillestad Winans' motion for summary

14   judgment, Margaret Ogden, a supervisory attorney employed at FDC SeaTac, states that plaintiff

15   received all legal mail while he was on suicide watch and that she, in fact, personally delivered such

16   mail to him on more than one occasion.  (Dkt. No. 90 at 1-2.)

17         Plaintiff offers no evidence that he was ever denied any of his legal mail or that the denial of

18   his personal mail was intended to punish him.[4]  Accordingly, Dr. Skillestad Winans is entitled to

19   summary judgment with respect to this claim as well.

20                        <u>CONCLUSION</u>

21         Based upon the foregoing, this Court recommends that Dr. Skillestad Winans' motion for

22   _____

23         [4]  It is not clear whether plaintiff ever received any personal mail while he was on suicide
24   watch.  However, the record reflects that while plaintiff was on suicide watch between August 16,
     2007 and August 27, 2007, he was provided with stationary and stamps so that he could write and
25   send both legal mail and personal mail.  (Dkt. No. 89 at 7.)

26   REPORT AND RECOMMENDATION
     PAGE - 11

summary judgment be granted and that plaintiff's amended complaint, and this action, be dismissed with prejudice with respect to plaintiff's claims that he was denied showers, blankets and mail while on suicide watch.  A proposed order accompanies this Report and Recommendation.

DATED this 9th day of December, 2010.

JAMES P. DONOHUE
United States Magistrate Judge

REPORT AND RECOMMENDATION
PAGE - 12